IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHARLIE WRIGHT, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-05-1657 |
| | § | |
| JO ANNE B. BARNHART, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant*. | § | |

**MEMORANDUM AND ORDER**

Pending before the court are Plaintiff Charlie Wright's ("Wright") and Defendant Jo Anne B.

Barnhart's, Commissioner of the Social Security Administration ("Commissioner"), cross-motions

for summary judgment.  Wright appeals the determination of an Administrative Law Judge ("ALJ")

that he is not entitled to receive Title II disability insurance benefits or Title XVI supplemental

security income ("SSI") benefits.  *See* 42 U.S.C. §§ 416(i), 423, 1382c(a)(3)(A).  Having reviewed

the pending motions, the submissions of the parties, the pleadings, the administrative record, and the

applicable law, this Court is of the opinion that Wright's Motion for Summary Judgment (Docket

Entry No. 11) should be denied, the Commissioner's Motion for Summary Judgment (Docket Entry

No. 12) should be granted, and the ALJ's decision denying benefits be affirmed.

I.   ***Background***

On August 15, 2001, Wright filed applications for disability insurance benefits and

supplemental security income with the Social Security Administration ("SSA"), claiming that he had

been disabled and unable to work since January 15, 2001, due to a back injury.  (R. 12, 138-140,

211).  Wright subsequently amended the onset date of his disability to August 10, 2001.  (R. 38).

Both applications were denied initially and on reconsideration.  (R. 92-103).  Wright requested, and was granted, an administrative hearing before an ALJ to review the decisions.  (R. 104).

An administrative hearing was initially scheduled for June 11, 2003, in Victoria, Texas; however, after the ALJ questioned Wright at that hearing, the ALJ determined that Wright needed a consultative medical examination with an orthopedist and, therefore, postponed the hearing. (R. 81-85).  A new hearing was held on November 20, 2003, at which the ALJ heard testimony from Wright and Carl Simpson, M.D. ("Dr. Simpson"), a medical expert.  (R. 32-80).  Thereafter, in a letter dated December 1, 2003, Wright's attorney accused Dr. Simpson of being biased against Wright.  (R. 12, 127).  This allegation was based on an off-the-record conversation Wright's counsel had with Dr. Simpson on the day of the hearing.  (R. 12, 127).  Dr. Simpson allegedly told Wright's counsel that "you pretty much have to be in a wheelchair for me to find a person disabled." (R. 12, 127).  Hence, Wright's counsel argued that Dr. Simpson's testimony could not be trusted to be fair and impartial.  (R. 12, 127).  In response to the letter from Wright's counsel, on January 15, 2004, the ALJ conducted a supplemental hearing to deal solely with the issue of whether Dr. Simpson's opinions expressed at the hearing were biased against Wright.  (R. 12-13, 22-31).  At the supplemental hearing, Wright's counsel testified that she could not remember the exact words spoken by Dr. Simpson, but that they were something like the ones she expressed in her letter on December 1, 2003, to the ALJ.  (R. 13, 27).  Dr. Simpson testified that he could not remember what he had said, but stated that he might have said something like that.  (R. 13, 28-29).

In a decision dated February 9, 2004, the ALJ denied Wright's applications for benefits. (R. 12-20).  The ALJ considered the allegation of Wright's counsel and weighed it against Dr. Simpson's testimony.  (R. 13).  The ALJ determined that "[r]egardless of the verbal interchange

2

between the medical expert and the claimant's representative off-the-record on the day of the hearing, the fact remains that the opinions expressed by the medical expert on-the-record are supported by the medical evidence and therefore the claimant has not been prejudiced."  (R. 13). Wright appealed the decision to the Appeals Council of the SSA's Office of Hearings and Appeals, which, on March 7, 2005, declined to review the ALJ determination.  (R. 4-8).  This rendered the ALJ's opinion the final decision of the Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Wright filed his Original Complaint in this case on May 9, 2005, seeking review of the Commissioner's denial of the claims for benefits.  *See* Docket Entry No. 1.

## II.   *Analysis*

### A.   *Statutory Bases for Benefits*

SSI benefits are authorized by Title XVI of the Act and are funded by general tax revenues. *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001). The SSI Program is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line.  *See* 20 C.F.R. § 416.110.  Eligibility for SSI is based upon proof of indigence and disability.  *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C).  A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which he applies for benefits, no matter how long he has actually been disabled.  *See Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); *see also* 20 C.F.R. § 416.335.  The applicable regulation provides:

> When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application.  If you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month.

20 C.F.R. § 416.335.  Thus, the month following an application, here, September 2001, fixes the earliest date from which benefits can be paid.  Eligibility for SSI payments, however, is not dependent on insured status.  *See* 42 U.S.C. § 1382(a).

Social security disability insurance benefits are authorized by Title II of the Act and are funded by social security taxes.  *See also* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100.  The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence.  A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application.  *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger*, 516 F. 2d 1005, 1007 n.1 (5th Cir. 1975); *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997).

While these are separate and distinct programs, applicants seeking benefits under either statutory provision must prove "disability" within the meaning of the Act, which defines disability in virtually identical language for both programs.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a).  Under both provisions, disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A).  Moreover, the law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI.  *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995).

**B.**  _**Standard of Review**_

**1.**  _**Summary Judgment**_

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case.  If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact.  _See Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case.  _See Duplantis v. Shell Offshore, Inc._, 948 F.2d 187, 189 (5th Cir. 1991).  When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position.  _See McAllister v. Resolution Trust Corp._, 201 F.3d 570, 574 (5th Cir. 2000).  If there are no issues of material fact, the court shall review any questions of law _de novo_.  _See Merritt-Campbell, Inc. v. RxP Prods., Inc._, 164 F.3d 957, 961 (5th Cir. 1999).  Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment.  _See Matsushita Elec. Indus. Co. v. Zenith Radio Corp._, 475 U.S. 574, 586 (1986); _International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V._, 199 F.3d 796, 798 (5th Cir. 2000).

2.     *__Administrative Determination__*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence.  *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).  "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d 272; *Brown*, 192 F.3d at 496.

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present."  *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002).  Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision.  *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).  The court may not, however, re-weigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.  *See Masterson*, 309 F.3d at 272.  In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve."  *Id.*

C.     *__ALJ's Determination__*

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1.     An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2.    An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5.    If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 704-05. The claimant has the burden to prove disability under the first four steps. *See Myers*, 238 F.3d at 619. If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. *See Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236. If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of his existing impairments, the burden shifts back to the claimant to prove that he cannot, in fact, perform the alternate work suggested. *See Boyd*, 239 F.3d at 705. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See id.*

The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992). An individual claiming disability benefits under the Act has the burden to prove that he suffers from a disability as defined by the Act. *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340,

343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  A claimant is deemed disabled under the Act only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit.  *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. §§ 404.1572(a)-(b), 416.972.

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3).  "[A]n individual is 'under a disability, only if his impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'"  *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)).  This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if he applied.  *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).  In the case at bar, when addressing the first four steps, the ALJ determined:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.      The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.      The claimant's herniated lumbar discs is a "severe" impairment, based upon the requirements in the Regulations (20 C.F.R. §§ 404.1520 and 416.920).

4.      This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.      The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

* * *

7.      The claimant is unable to perform any of his past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(R. 19).  As to the fifth step, the ALJ concluded:

6.      The claimant has the following residual functional capacity: lift and carry up to 50 pounds occasionally and 25 pounds frequently and can sit, stand, and/or walk 6 to 8 hours in an 8-hour day.

* * *

8.      The claimant is a "younger individual between the ages of 18 and 44" (20 C.F.R. §§ 404.1563 and 416.963).

9.      The claimant has "a limited education" (20 C.F.R. §§ 404.1564 and 416.964).

10.     The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 C.F.R. §§ 404.1568 and 416.968).

11.     The claimant has the residual functional capacity to perform the full range of medium work (20 C.F.R. §§ 404.1567 and 416.967).

12.     Based on an exertional capacity for medium work, and the claimant's age, education, and work experience, a finding of "not disabled" is directed by Medical-Vocational Rule 203.25.

13.    The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

(R. 19-20).

This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). To determine whether the decision to deny Wright's claim for disability benefits is supported by substantial evidence, the Court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the claimant's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the claimant's age, educational background, and work history. *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)). Any conflicts in the evidence are to be resolved by the ALJ, and not the court. *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

**D.** *Issues Presented*

Wright contends that the decision of the ALJ is not supported by substantial evidence. Specifically, Wright claims that the ALJ erred by failing to properly evaluate the medical evidence and by failing to properly evaluate the credibility of Wright's subjective complaints. *See* Docket Entry No. 11. The Commissioner disagrees with Wright's contentions, maintaining that the ALJ's decision is supported by substantial evidence. *See* Docket Entry No. 12.

E.      *Review of ALJ's Decision*

    1.      *Objective Medical Evidence and Opinions of Physicians*

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990). If the claimant is not actually working and his impairments match or are equivalent to one of the listed impairments, he is presumed to be disabled and qualifies for benefits without further inquiry. *See id.* at 532; *see also* 20 C.F.R. § 416.920(d). When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. §§ 404.1523, 416.923; *see also Loza*, 219 F.3d at 393. The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment. *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that his impairment or combination of impairments is equivalent to or greater than a listed impairment. *See id.* at 530-31; *Selders*, 914 F.2d

at 619.  The listings describe a variety of physical and mental illnesses and abnormalities, and are typically categorized by the body system they affect.  *See Zebley*, 493 U.S. at 529-30.  Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results.  *See id.* at 530.  For a claimant to demonstrate that his disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria.  *See id.*  An impairment, no matter how severe, does not qualify if that impairment manifests only some of the specified criteria.  *See id.*

For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is equivalent to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.  *See id.* at 531 (citing 20 C.F.R. § 416.926(a)).  A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings.  *See* 20 C.F.R. §§ 404.1526(a), 416.926(a).  The applicable regulations further provide:

> (1)(I)   If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—
>
> > (A)   You do not exhibit one or more of the medical findings specified in the particular listing, or
> >
> > (B)   You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;
>
> (ii)   We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

20 C.F.R. §§ 404.1526(a), 416.926(a).  Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment."  *Zebley*, 493 U.S. at 531.

12

Ultimately, the question of equivalence is an issue reserved for the Commissioner. *See Spellman v. Shalala*, 1 F.3d 357 (5th Cir. 1993); 20 C.F.R. §§ 404.1527(e), 416.927(e).

A review of the medical records submitted in connection with Wright's administrative hearing reveals that Wright suffered a work-related injury to his back on March 13, 1996. (R. 197). On August 9, 1996, x-rays of Wright's back showed a normal lumbar[1] spine series. (R. 237). The was proper alignment of the bony structures with no acute abnormality. (R. 237). On October 22, 1996, a CT[2] scan of the lumbar spine revealed central herniation[3] at L3-4 and L4-5. (R. 238). There was no suggestion of nerve root impingement. (R. 210, 238).

On January 5, 2000, Wright had an MRI on his cervical[4] spine, which revealed degenerative[5] changes and areas of central and foraminal[6] stenosis.[7] (R. 194). On October 7, 2000, an MRI on Wright's lumbar spine showed discogenic[8] changes in L3-4 and L4-5. (R. 194).

---

[1] "Lumbar" refers to the parts of the sides of the back between the thorax and the pelvis. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1029 (29th ed. 2000).

[2] "CT" refers to computed tomography. "Tomography" refers to the recording of internal body images at a predetermined plane. *See* DORLAND'S, *supra*, at 429, 1848.

[3] "Herniation" refers to an abnormal protrusion of an organ or other body structure through a defect or natural opening in a covering, membrane, muscle, or bone. *See* DORLAND'S, *supra*, at 814.

[4] "Cervical" refers to anything pertaining to the neck. *See* DORLAND'S, *supra*, at 325.

[5] "Degenerative Disease" is a disease characterized by the progressive impairment of the function of an organ or organs and not attributable to some cause such as an infection or a metabolic defect. *See* GOULD'S MEDICAL DICTIONARY 363 (4th ed. 1979).

[6] "Foramen" is a general term for a natural opening or passage especially one into or through a bone. *See* DORLAND'S, *supra*, at 696.

[7] "Stenosis" refers to an abnormal narrowing of a duct or canal. *See* DORLAND'S, *supra*, at 1698.

[8] "Discogenic" refers to anything caused by derangement of an intervertebral disk. *See* DORLAND'S, *supra*, at 510.

13

On February 19, 2001, Wright sustained an on-the-job injury to his back while lifting and pulling on steel. (R. 205). Wright reportedly experienced an immediate onset of pain. (R. 205).

In April 2001, Wright began seeing Paul T. Hoang, D.O. ("Dr. Hoang") with complaints of chronic back pain. (R. 211). Dr. Hoang noted that Wright had negative discograms for L3-4 and L4-5 and was prescribed Skelaxin three times a day, but he had only been taking it twice a day. (R. 224). Dr. Hoang noted that Wright was having significant amounts of muscle spasms. (R. 224). Dr. Hoang recommended increasing his medication to improve the muscle spasms and that Wright be evaluated by a neurosurgeon. (R. 224).

Three days later, on April 26, 2001, Wright saw Peter Minh Nguyen, M.D. ("Dr. Nguyen"); Dr. Nguyen reported no signs of muscle spasms. (R. 211). In his initial consultation with Dr. Nguyen, Wright advised that he had suffered two separate work related injuries to his back, one occurring in 1999, and the other in 2000. (R. 211). Wright also reported experiencing chronic low back pain that rated an average of seven (7) to eight (8) on a scale from one (1) to ten (10). (R. 211). Dr. Nguyen reported that Wright was only able to flex forward with his fingers to mid-thigh level, but Dr. Nguyen observed that Wright was able to sit in a chair with his legs at 90 degrees flexion without any discomfort. (R. 212). Additionally, Wright was observed to be able to walk without any difficulty. (R. 212). Dr. Nguyen assessed Wright as having chronic low back pain and ordered several follow-up studies as well as continued pain management. (R. 213).

On May 2, 2001, Wright underwent an electrodiagnostic consultation with Cesar B. Velasco, M.D. ("Dr. Velasco"). (R. 220-223). Dr. Velasco concluded that Wright had a normal nerve conduction of bilateral lower extremities, with no evidence of peripheral polyneuropathy[9] noted, and

---

[9]  "Polyneuropathy" refers to the neuropathy of several peripheral nerves simultaneously. "Neuropathy" refers to a functional disturbance or pathological change in the peripheral nervous system, sometimes limited

the H-reflex[10] was within normal limits.  (R. 221).  Dr. Velasco noted that there was no abnormal

spontaneous activity on lower extremity muscles tested.  Lumbar paraspinals, however, could not

be fully assessed during this test due to Wright having difficulty relaxing the necessary muscles.

(R. 221).

On May 25, 2001, Wright had an appointment with Dr. Nguyen.  (R. 209-210).  Dr. Nguyen

noted that Wright had failed to keep his previous follow-up appointment.  (R. 210-211).  At the

appointment, Dr. Nguyen observed that Wright was in no apparent distress.  (R. 209).  No muscle

spasms were noted.  (R. 209).  Wright complained of tenderness in his lower lumbar region with only

light pressure palpation.  (R. 209).  Dr. Nguyen reported that Wright was able to stand on his heels

and toes and able to squat.  (R. 209-210).  Additionally, Wright was able to flex forward with his

hands at knee level.  (R. 210).  Dr. Nguyen's assessment was chronic low back pain.  (R. 210).

According to Dr. Nguyen, Wright had reached his maximum medical improvement with his

condition stable over the past two years.  (R. 210).  Dr. Nguyen recommended that a functional

capacity evaluation and impairment rating be prepared.  (R. 210).  Dr. Nguyen further suggested that,

thereafter, Wright should be placed in a work environment that would match his functional

capabilities.  (R. 210).

On June 5, 2001, Wright underwent a Comprehensive Functional Capacity Evaluation at the

Victoria Functional Assessment and Restoration Center.  (R. 204-208).  This evaluation summarized

Wright's physical demand as being light to medium and recommended that Wright return to work

at a light to medium physical demand.  (R. 204).  The test administrator noted that when the study

---

to noninflammatory lesions as opposed to those of the neuritis.  *See* DORLAND'S, *supra*, at 1212, 1432.

[10]  "H-reflex" refers to a monosynaptic reflex elicited by stimulating a nerve, particularly the tibial nerve, with an electric shock.  *See* DORLAND'S, *supra*, at 1547.

results were compared with a lifting exercise completed by Wright, the test results were not consistent with the expected test intra-relationship results. (R. 206).

On July 23, 2001, Wright visited Dr. Nguyen for an Impairment Rating Evaluation. (R. 197-203). Dr. Nguyen summarized Wright's history of lower back pain and treatment. (R. 198). Dr. Nguyen noted that Wright had been referred to a neurosurgeon for evaluation of surgery and deemed not a surgical candidate. (R. 198). It was further reported that Wright previously had completed a Comprehensive Functional Capacity Evaluation and was returned to work in a position that he qualified for and that was in line with his physical work capabilities; however, Wright, reportedly declined the modified job offer and terminated his employment. (R. 198). According to Dr. Nguyen, Wright had only a one percent (1%) whole person impairment which was an improvement from the four percent (4%) whole person impairment he had in 1996 from a separate work-related back injury. (R. 199). On July 24, 2001, Dr. Nguyen completed an impairment rating summary for Wright's employer's insurance, listing diagnoses of spinal stenosis-lumbar and disc degeneration.[11] (R. 197).

On November 30, 2001, John Howard Durfor, M.D. ("Dr. Durfor") reviewed Wright's medical records for the SSA and determined that Wright had a non-severe impairment, finding no neurological deficits. (R. 190). Dr. Durfor further noted that Wrights alleged limitations caused by his back pain were not supported by the medical reports. (R. 190).

On February 8, 2002, Crayton Cibrowski, M.D. ("Dr. Cibrowski") completed a Lumbar Spine Impairment Questionnaire. (R. 240-246). Dr. Cibrowski noted that he initially began to treat Wright on June 3, 1996; however, his most recent examination of Wright was on November 5, 2001, and that his frequency of treatment of Wright ranged from every two years to several times a year.

---

[11] "Degeneration" refers to a deterioration or change of tissue to a lower or less functionally active form. *See* DORLAND'S, *supra*, at 465.

(R. 240).  Dr. Cibrowski opined that Wright had degenerative disc disease of the lumbar spine with herniated nucleous pulposis at L3-4 and L4-5.  (R. 240).  Dr. Cibrowski observed that Wright had no abnormal gait.[12]  (R. 241).  Dr. Cibrowski noted that he had not assessed Wright's pain symptoms since November 2001 because Wright had not returned for a follow-up appointment.  (R. 242).

On March 26, 2002, Paul W. Sundin, M.D. ("Dr. Sundin") completed a case assessment form for the SSA, finding that Wright's back problems were non-severe.  (R. 188).  Dr. Sundin noted that Wright walked normally with no evidence of significant pain.  (R. 188).  Dr. Sundin concluded that Wright's alleged limitations caused by his symptoms were not fully supported by the evidence.  (R. 188).

In a letter to Wright's counsel dated May 7, 2002, Dr. Cibrowski restricted Wright from lifting weights greater than five (5) pounds, pending results of diagnostic studies and consultant reports.  (R. 236).  Again, Dr. Cibrowski noted that he had not seen Wright since November 5, 2001; thus, the effects of certain medications prescribed could not be ascertained.  (R. 236).  Likewise, his prognosis for recovery could not be determined by Dr. Cibrowski.  (R. 236).

On November 12, 2002, Wright had a chest x-ray; no intrathoracic disease was identified.  (R. 259).

At the request of the ALJ, on August 4, 2003, Wright saw Mark A. Heard, M.D. ("Dr. Heard") for a consultative examination.  Dr. Heard noted that Wright had reportedly suffered from neck and low back pain for about five years, and had been taking some pain medication at home when he had it.  (R. 251)  Upon neurological examination, Dr. Heard reported that Wright's cranial nerves were intact; reflexes were intact; strength and sensation appeared grossly normal; alternating

---

[12]  "Gait" refers to the manner or style of walking.  *See* Dorland's, *supra*, at 721.

motions were intact; Babinski was not seen; Romberg was negative; slow flexion to approximately 45-degrees; negative straight leg raising with only pain in his low back elicited; some rigidity to his low bac and rather rigid on flexion; and the cervical spine showed no palpable abnormality and a full range of motion.  (R. 252).  Dr. Heard noted that Wright had been evaluated by another doctor and was deemed not to be a surgical candidate.  (R. 251).  A lumbar spine x-ray taken from two views demonstrated normal alignment of the lumbar vertebral bodies.  (R. 253).  The disc spaces were normal.  (R. 253).  There was no spondylosthesis or spondylolysis.  (R. 253).  Also, no fractures were seen.  (R. 253).  Based on his examination, Dr. Heard concluded that Wright would be able to lift twenty (20) pounds occasionally, and five (5) pounds frequently.  (R. 252, 254-255).  Wright's ability to stand and walk was found not to be affected.  (R. 254).  Dr. Heard noted that Wright would be limited to sitting less than 6 hours in an 8 hour workday, and that he would have trouble climbing, balancing, stooping, crouching, kneeling, or crawling, but he would have no problem handling, fingering, feeling, or reaching.  (R. 252).

On September 22, 2004, Dr. Cibrowski sent a note to Wright's counsel, opining that Wright could not perform any heavy lifting.  (R. 266-267).  According to Dr. Cibrowski, Wright could not return to manual labor because of his spinal condition, and he did not believe that he had the skills for a sedentary occupation without retraining.  (R. 267).

"[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  The opinion of a specialist generally is accorded greater weight than that of a non-specialist.  *See Newton*, 209 F.3d at 455; *Paul*

18

*v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S.

103, 108 (2000).  Medical opinions are given deference, however, only if those opinions are shown

to be more than conclusory and supported by clinical and laboratory findings.  *See Scott*, 770 F.2d

at 485.  Moreover, a treating physician's opinions are far from conclusive and may be assigned little

or no weight when good cause is shown.  *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395;

*Greenspan*, 38 F.3d at 237.  Good cause may permit an ALJ to discount the weight of a treating

physician's opinion in favor of other experts when the treating physician's evidence is conclusory,

unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise

unsupported by the evidence.  *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456; *see also Brown*,

192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211.  It is well settled that even though

the opinion and diagnosis of a treating physician should be afforded considerable weight in

determining disability, the ALJ has sole responsibility for determining a claimant's disability status.

*See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

In the case at bar, there is substantial evidence in the record to support the ALJ's

determination that Wright suffered from impairments which did not meet or equal the requirements

of a listing.  Wright contends that the ALJ erred by improperly dismissing his treating physician's

findings (*i.e.*, Dr. Cibrowski).  *See* Docket Entry No. 11. Wright argues that Dr. Cibrowski evaluated

him ten different occasions.  *See* Docket Entry No. 11.

The Social Security Regulations provide a framework for the consideration of expert medical

opinions of a claimant's treating physician.  Under 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2),

consideration of a treating physician's opinion must be based on:

(1)     the physician's length of treatment of the claimant,

19

(2)      the physician's frequency of examination,

(3)      the nature and extent of the treatment relationship,

(4)      the support of the physician's opinion afforded by the medical evidence of
           record,

(5)      the consistency of the opinion with the record as a whole, and

(6)      the specialization of the treating physician.

*Newton*, 209 F.3d at 456 (citing 20 C.F.R. § 404.1527(d)(2)); *accord Myers*, 238 F.3d at 621; *see also* 20 C.F.R. 416.927(d)(2).  In this regard, SSR 96-2p provides:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  *Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.*  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted even if it does not meet the test for controlling weight.

*Newton*, 209 F.3d at 456 (emphasis in original) (quoting 61 Fed. Reg. 34490, 34491 (July 2, 1996)).

Here, although Wright correctly notes that Dr. Cibrowski treated him nine or ten times, this was over a period of five and one-half years (1996-2001).  (R. 236, 266-267).  An average of less than two visits per year is a relatively infrequent basis considering the level of pain Wright reportedly experienced.  Moreover, Dr. Cibrowski's opinions were properly given less deference because his conclusions were not supported by objective medical evidence, and his opinions were not consistent with the record as a whole.  *See Scott*, 770 F.2d at 485.

Indeed, Dr. Hoang examined Wright in April 2001 and noted that discograms of Wright's L3-4 and L4-5 disc levels were negative.  (R. 224).  He also found that Wright had significant muscle spasms.  (R. 224).  Also, in April 2001, Dr. Nguyen reported that Wright's spine was in good

alignment; Wright was experiencing no significant muscle spasms; he was able to walk without difficulty; and, despite only being able to flex forward with fingers to mid-thigh level, Wright was able to sit in a chair with his legs at ninety (90) degrees flexion without any discomfort.  (R. 212-213).   Furthermore, in May 2001, Dr. Velasco reported normal  results of the bilateral lower extremities nerve conduction study.  (R. 221).  Additionally, Dr. Velasco observed no evidence of peripheral polyneuropathy; Wright's H-reflex was within normal limits; and ,there was no abnormal spontaneous activity on the muscles tested.  (R. 221).

In June 2005, a functional capacity evaluation, revealed that Wright could return to work at a light to medium physical demand level.  (R. 204).  Wright's sensation was reported as normal; his deep tendon reflexes were intact; and Wright's endurance test on a stationary bike showed that he met the energy level required for a medium heavy physical demand level.  (R. 205, 20

The next month, July 2001, office notes from Dr. Nguyen indicated that Wright was able to return to work for his employer in a position that he qualified for and was in line with his physical work capabilities, but that Wright had declined the modified job offer and terminated his employment with that employer.  (R. 198).  Dr. Nguyen also reported that Wright was able to stand on his toes and heels without difficulty, fully squat without any problems, had no significant muscle spasms, and motor and sensory functioning were intact.  (R. 198-199).  The lack of evidence illustrating neurological deficits and muscle atrophy is important because the Fifth Circuit has held that the lack of these clinical findings supports an ALJ's denial of benefits.  *See Hollis v. Bowen*, 837 F.2d 1378, 1384 (5th Cir. 1988); *see also Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987).

Wright objects to the ALJ's consideration of the medical expert's testimony because of an alleged off the record statement that, "you pretty much have to be in a wheelchair for me to find a

person disabled." (R. 22-31).  Wright asserts that this is evidence of bias testimony.  The record is

inconclusive as to whether Dr. Simpson made this statement; nevertheless, the ALJ conducted a

supplemental hearing to consider the issue and, ultimately, correctly found that "[r]egardless of the

verbal interchange between the medical expert and the claimant's representative off-the-record on

the day of the hearing, the fact remains that the opinions expressed by the medical expert on-the-

record are supported by the medical evidence and therefore the claimant has not been prejudiced."

(R. 13).  Based on the objective medical facts and opinions of physicians, there is substantial

evidence in the record to support the ALJ's determination that Wright suffered from impairments

which did not meet or equal the requirements of a listing.

> **2.** ***Subjective Complaints***

The law requires the ALJ to make affirmative findings regarding a claimant's subjective

complaints.  *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Scharlow v. Schweiker*,

655 F.2d 645, 648-49 (5th Cir. 1981)).  When a plaintiff alleges disability resulting from pain, he

must establish a medically determinable impairment that is capable of producing disabling pain.  *See*

*Ripley*, 67 F.3d at 556 (citing 20 C.F.R. § 404.1529).  Once a medical impairment is established, the

subjective complaints of pain must be considered along with the medical evidence in determining

the individual's work capacity.  *See id.*  It is well settled that an ALJ's credibility findings on a

claimant's subjective complaints are entitled to deference.  *See Chambliss v. Massanari*, 269 F.3d

520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164;

*Wren*, 925 F.2d at 128.  The Fifth Circuit recognizes that "the ALJ is best positioned" to make these

determinations because of the opportunity to observe the claimant first-hand.  *See Falco*, 27 F.3d at

164 n.18.  Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that

subjective complaints be corroborated, at least in part, by objective medical findings." *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability. *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986). Additionally, the mere existence of pain does not automatically bring a finding of disability. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281. It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort. *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128. The decision arising from the ALJ's discretion to determine whether pain is disabling is entitled to considerable deference. *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at 128; *James*, 793 F.2d 702, 706 (5th Cir. 1986). However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record. *See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

At the administrative hearing, Wright testified regarding his complaints of pain. (R. 40-41, 44-47, 57, 60, 62-64). The ALJ's decision indicates that the ALJ did consider objective and subjective indicators related to the severity of Wright's pain.

> The claimant complains of severe low back pain even though objective medical testing has failed to reveal an impairment that would be expected to cause pain of the degree that he alleges. He testified that he has low back pain above his belt line that radiates to his left side and down to his left knee as well as up the middle of his back to his neck. However, electrodiagnostic studies found no evidence of neuropathy. He stated that he spends most of a normal day lying down, but medical reports note his complaints of this increasing his pain. He stated that he is unable to sit more than 15 minutes, but then admitted that he drove to the hearing, which was a drive of 45 minutes. Under questioning by his representative, he said that he was hurting from that drive although he exhibited no evidence of pain at the hearing. Claimant has indicated in the past that he has trouble sleeping because of back pain. However, he testified that he goes to bed at 11:30 p.m. and gets up at 11:30 a.m. other than getting up 4 to 5 times to go to the bathroom. He voiced no complaints at the hearing of pain interrupting his sleep. He said that he uses a cane, but admits that it was not medically prescribed. Severe back pain will usually result in muscle spasms. However, medical reports have said that the claimant did not have muscle spasms. The one exception is the report of Dr. Cibrowski dated April 23, 2001, which stated on examination that day the claimant had a significant amount of muscle spasms (Exh. B2F/49). However, at an examination by Dr. Nguyen 3 days later, there was no sign of muscle spasms (Exh. B1F/3). It is unclear how he could have significant muscle spasms on one day and subsequent examinations found no evidence of muscle spasms. If present on April 23, 2001, the muscle spasms resolved quickly and have not returned. In a pain report he completed when he filed his applications, he listed nine different medications for pain that he said he had taken. However at the hearing, he stated that he was not taking any medication for his pain. A review of the claimants earnings record shows that he had an inconsistent work history (Exh. B3D/1). The claimant's subjective complaints of severe low back pain are not credible.

(R. 17). The ALJ's findings are supported by the medical records.

Wright claims that he became disabled on August 10, 2001.[13] (R. 38). Evidence that Wright drives his vehicle, bathes himself, dresses himself, shaves himself, brushes his teeth, visits with his brother, washes dishes, sweeps the house, and washes clothes all weigh against him. *See Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991) (a plaintiff's activities may properly be considered when deciding a plaintiff's disability status). Wright's relatively normal level of activity is inconsistent

---

[13] It is unclear why the claimant amended his onset date. This was done at the hearing on November 20, 2003. The original onset date was January 13, 2001.

with his allegations of disabling pain and limitation, and corroborates the ALJ's findings that Wright did not have an impairment that precluded his performance of medium work. *See Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995).

Wright's testimony at the hearing is inconsistent. The ALJ asked him if he propped his legs up on a pillow when he would lie on the couch and Wright answered the question in the affirmative. (R. 46). The ALJ then asked if this made the pain worse, and Wright replied "yes." (R. 46). It seems unlikely that a person would intentionally position himself in a manner that causes more pain. Wright has also stated that he has problems sitting for longer than fifteen (15) minutes at one time, but he also testified that he drove himself to the hearing and that the drive was forty-five (45) minutes long. (R. 49, 61).

Wright testified at the hearing that he had not seen a physician since the last time the Social Security Administration sent him to one, because he could not afford to pay doctor bills. (R. 48). But Wright has presented no evidence that he tried to seek, but was denied, indigent health care during this time frame. *See Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999) (claimant must demonstrate that he attempted to receive indigent health care) (citing *Murphy v. Sullivan*, 953 F.2d 383, 386-87 (8th Cir. 1992) (it is inconsistent with the degree of pain and disability asserted where no evidence exists that the claimant attempted to find any low cost or no cost medical treatment for alleged pain and disability)).

Wright's complaint that the ALJ improperly subjected Wright to "sit and squirm" jurisprudence is misplaced. *See Muncy v. Apfel*, 247 F.3d 728, 736 (8th Cir. 2001); *Flores v. Massanari*, 19 Fed. Appx. 393, 404 (7th Cir. 2001); *Puckett v. Barnhart*, No. 1:01-cv-584, 2003 WL 1831066, at *9 (E.D. Tex. Feb. 5, 2003). While a claimant's demeanor may not be relied upon

exclusively to deny benefits, an ALJ may cite to a claimant's demeanor at the hearing if it is clear that the ALJ, as here, considered other factors to deny disability benefits.  *See Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987); *see also Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990); *Burnside v. Bowen*, 845 F.2d 587, 592 (5th Cir. 1988), *abrogated on other grounds by Sullivan v. Zebley*, 493 U.S. 521 (1990).  In the case at bar, the ALJ considered the hearing testimony and carefully reviewed the medical evidence before reaching his decision; he did not merely rely on a "sit and squirm doctrine" to discount his credibility.  (R. 12-20).

The Court does not doubt that Wright suffers from pain; however, the records do not support a finding that Wright's pain is constant, unremitting, and wholly unresponsive to therapeutic treatment.  *See Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.  Indeed, the record demonstrates that Wright was deemed not to be a surgical candidate and was treated conservatively with medication, steroid injections, and physical therapy.  (R. 209, 222, 224, 251). Medical impairments that reasonably can be remedied or controlled by medication or treatment are not disabling."  *Glenn v. Barnhart*, 124 Fed. Appx. 828, 829 (5th Cir. 2005) (citing *Johnson v. Bowen*, 864 F.2d 340, 347 (5th Cir. 1988); *Fraga v. Bowen*, 810 F.2d 1296, 1303-04 (5th Cir. 1987); *Adams v. Bowen*, 833 F.2d 509, 511-12 (5th Cir. 1987)).  Accordingly, there is substantial evidence that supports the ALJ's finding that Wright's subjective complaints of pain do not rise to the level of disability.  *See Ortiz v. Barnhart*, 70 Fed. Appx. 162, 164 (5th Cir. 2003); *Jones v. Barnhart*, 35 Fed. Appx. 390 (5th Cir. 2002).

3.      ***Residual Functional Capacity***

Under the Act, a person is considered disabled:

only if his physical or mental impairment or impairments are of such severity that [he] is not only unable to do his previous work but cannot, considering [his] age,

education, and work experience, engage in any other kind of substantial gainful
work which exists in the national economy, regardless of whether such work exists
in the immediate area in which he lives, or whether a specific job vacancy exists
for [him], or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  If a claimant demonstrates that he cannot perform

his past relevant work, the Commissioner bears the burden of proving that his functional capacity,

age, education, and work experience allow him to perform work in the national economy.  *See*

*Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d

at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236.  Once the Commissioner fulfills this

burden by pointing out potential alternative employment, the claimant, in order to prevail, must

prove that he cannot perform the alternate work suggested.  *See Masterson*, 309 F.3d at 272;

*Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey*, 230 F.3d 131, 135 (5th Cir. 2000).

To determine whether an applicant can return to a former job or, if never employed, can

perform substantial work in the national economy, the regulations require the ALJ to evaluate the

applicant's residual functional capacity ("RFC").  *See Carter v. Heckler*, 712 F.2d 137, 140 (5th

Cir. 1983) (citing 20 C.F.R. §§ 404.1561, 416.961).  This term of art merely designates the

ability to work despite physical or mental impairments.  *See id.*; *see also* 20 C.F.R. §§ 404.1545,

416.945.  "Residual functional capacity" combines a medical assessment with the descriptions by

physicians, the applicant or others of any limitations on the applicant's ability to work.  *See id.*

When a claimant's RFC is not sufficient to permit him to continue his former work, then his age,

education, and work experience must be considered in evaluating whether he is capable of

performing any other work.  *See* 20 C.F.R. §§ 404.1561, 416.961.  The testimony of a vocational

expert is valuable in this regard, as "he is familiar with the specific requirements of a particular

occupation, including working conditions and the attributes and skills needed."  *Carey*, 230 F.3d

27

at 145; *see also Masterson*, 309 F.3d at 273; *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995); *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986).   In the absence of contrary evidence, the ALJ may properly rely on the testimony of a vocational expert in reaching a conclusion regarding a claimant's RFC to perform work available in the national economy.  *See Masterson*, 309 F.3d at 273.

Moreover, under certain circumstances, the ALJ's application of the medical-vocational guidelines set forth in Appendix 2 of Subpart P of the regulations, also referred to as the grids, without testimony from a vocational expert, is sufficient to assess whether a claimant is able to work or is disabled under the Act.  *See Heckler v. Campbell*, 461 U.S. 458, 467, 470 (1983).  As the Supreme Court explained in *Campbell*:

> These guidelines relieve the Secretary of the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy.   They consist of a matrix of the four factors identified by Congress–physical ability, age, education, and work experience–and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy.   Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion as to whether work exists that the claimant could perform.   If such work exists, the claimant is not considered disabled.

461 U.S. at 461-62 (footnotes omitted).   The Court elaborated:

> Each of these four factors is divided into defined categories. A person's ability to perform physical tasks, for example, is categorized according to the physical exertion requirements necessary to perform varying classes of jobs  — *i.e.*, whether a claimant can perform sedentary, light, medium, heavy, or very heavy work.  20 C.F.R. § 404.1567.   Each of these work categories is defined in terms of the physical demands it places on a worker, such as the weight of objects [he] must lift and whether extensive movement or use of arm and leg controls is required.  *Ibid.*

*Id.* at 462 n.3.

Under the regulations, impairments can be either exertional or nonexertional. *See Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000). Impairments are classified as exertional if they affect the claimant's ability to meet the strength demands of jobs. *Id.* The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertional levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling. *See id.*; *see also* 20 C.F.R. § 404.1569(a). All other impairments are classified as nonexertional. *See Sykes*, 228 F.3d at 263.

In evaluating RFC, the Fifth Circuit has looked to SSA rulings ("SSR"). The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See Myers*, 238 F.3d at 620 (citing *B.B. ex rel. A.L.B. v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir. 1981)). In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and the interplay of exertional and nonexertional factors:

> First, SSR 96-8p provides that a residual functional capacity (RFC) "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." "However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . ." RFC involves both exertional and nonexertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. "Each function must be considered separately." "In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (quoting 61 Fed. Reg. 34474-01 (July 2, 1996)).  The court also noted that SSR 96-9p defines exertional capacity as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated.  *See id.*  Thus, to determine that an applicant can do a given type of work, the ALJ must find that the applicant can meet the job's exertional and nonexertional requirements on a sustained basis and can maintain regular employment.  *See Watson*, 288 F.3d at 218; *Singletary v. Bowen*, 798 F.2d 818, 821 (5th Cir. 1986); *Carter*, 712 F.2d at 142 (citing *Dubose v. Mathews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

When a claimant suffers only exertional impairments and an ALJ's findings of residual functional capacity, age, education, and previous work experience coincide with the grids, the Commissioner may rely exclusively on the medical-vocational guidelines to determine whether work exists in the national economy which the claimant can perform.  *See Newton*, 209 F.3d at 458 (citing *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987); 20 C.F.R. § 404.1569(b)).  Nevertheless, " use of the grid rules is only appropriate 'when it is established that the claimant suffers only from exertional impairments, or that the claimant's nonexertional impairments do not significantly affect his residual functional capacity.' "  *Watson*, 288 F.3d at 216 (quoting *Crowley*, 197 F.3d at 199); *accord Loza v. Apfel*, 219 F.3d 378, 398 (5th Cir. 2000); *Newton*, 209 F.3d at 458.  If the claimant suffers from nonexertional impairments or a combination of exertional and nonexertional impairments, then the Commissioner must rely on a vocational expert to establish that suitable jobs exist in the economy.  *See id.*  Therefore, before applying the grids, it must be determined whether nonexertional factors, such as mental illness, significantly affect a claimant's RFC.  *See Loza*, 219 F.3d at 399; *Newton*, 209 F.3d at 459.

In the case at bar, the ALJ concluded that Wright was unable to perform any of his past relevant work. (R. 18). The ALJ determined that Wright had the residual functional capacity to lift and carry up to 50 pounds occasionally and 25 pounds frequently as well as sit, stand, and/or walk six to eight hours in an eight hour day. (R. 18-20). Applying Grid Rule 203.25, the ALJ found that the evidence supported a finding that Wright could perform the full demands of medium work and a finding of "not disabled" was directed. (R. 19); *see* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 203.25. The ALJ also noted that even if Wright was restricted to light work, which entails the ability to lift and carry up to 20 pounds occasionally and 10 pounds frequently, Grid Rule 202.17 would also direct a finding of "not disabled." (R. 19); *see* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.17.

Although Wright complains that the ALJ improperly discounted the opinion of his treating physician, Dr. Cibrowski, as well as the opinion of the consultative examiner of the SSA, Dr. Heard, regarding Wright's functional limitations, the ALJ correctly noted that their opinions were contrary to objective and subjective evidence supplied by other treating physicians. (R. 17). Moreover, contrary to Wright's contention, Dr. Cibrowski did not set forth a permanent lifting limitation of only five pounds for Wright; instead, Dr. Cibrowski noted in a May 2002 letter to Wright's counsel that "[*w]hen* the patient presents acutely I restrict to lifting weights no greater than 5 pounds *pending results of diagnostic studies and/or consultant reports.*" (R. 236) (emphasis added). Dr. Cibrowski noted in the letter, however, that he had not seen Wright since November 5, 2001. (R. 236). He further noted that he had only seen Wright once in 2001. (R. 236).

Additionally, the limitations suggested by Drs. Cibrowski and Heard contradicted other record evidence. As noted above, Dr. Hoang examined Wright in April 2001 and noted that Wright's discograms at L3-4 and L4-5 were negative. (R. 224). Dr. Nguyen also observed in April

2001 that Wright's spine was in good alignment; Wright was experiencing no significant muscle spasms; he was able to sit in a chair at ninety degrees flexion without any discomfort; and, he was able to walk without any difficulty. (R. 212-213).

In May 2001, Dr. Velasco concluded that Wright had a normal nerve conduction of bilateral lower extremities, with no evidence of peripheral polyneuropathy, and his H-reflex was within normal limits. (R. 221). Dr. Velasco further noted that there was no abnormal spontaneous activity on the lower extremity muscles tested. (R. 221). In late-May, Dr. Nguyen reported no muscle spasms; Wright was able to stand on his heels and toes and able to squat; and, he could flex forward with is hands at knee level. (R. 209-210). Dr. Nguyen assessed Wright with chronic low back pain and suggested that he return to work in an environment that matched his functional capabilities. (R. 210). On June 5, 2001, Wright underwent a Comprehensive Functional Capacity Evaluation, which summarized Wright's physical demand as being light to medium. (R. 204-208). In July 2001, Dr. Nguyen summarized Wright's history of lower back pain and treatment and assessed Wright with a 1% whole person impairment. (R. 199). Dr. Nguyen also noted that Wright was returned to work in a position that was in line with is physical work capabilities; however, Wright reportedly had declined the modified job offer and terminated his employment. (R. 198).

In March 2002, Dr. Sundin evaluated Wright and observed him to walk normally with no evidence of significant pain. (R. 188).

Because Drs. Cibrowski and Heard's conclusions conflicted with the objective and subjective evidence supplied by other treating physicians, the ALJ correctly gave such conclusions little weight.

III.   ***Conclusion***

In sum, the record provides substantial evidence supporting the Commissioner's decision that Wright is not disabled.  It is, therefore

**ORDERED** that Wright's Motion for Summary Judgment (Docket Entry No. 11) is **DENIED.**  It is further

**ORDERED** that the Commissioner's Motion for Summary Judgment (Docket Entry No. 12) is **GRANTED**.  It is further

**ORDERED** that the Commissioner's decision is **AFFIRMED.**  Finally, it is

**ORDERED** that this matter is **DISMISSED** from the dockets of this Court.

**SIGNED** at Houston, Texas on this the 31st day of July, 2006.

Calvin Botley
United States Magistrate Judge